**IN THE UNITED STATES DISTRICT COURT**
**FOR THE NORTHERN DISTRICT OF OHIO**
**EASTERN DIVISION**

**MARIAH ANDERSON**                                  Case No. 1:18 CV 662
**ON BEHALF OF M.C.B., JR.,**

     Plaintiff,

     v.                                            Magistrate Judge James R. Knepp II

**COMMISSIONER OF SOCIAL SECURITY,**

     Defendant.                            MEMORANDUM OPINION AND ORDER

## INTRODUCTION

Plaintiff Mariah Anderson ("Anderson") filed a Complaint against the Commissioner of Social Security ("Commissioner") on behalf of M.C.B. Jr. ("Plaintiff"), seeking judicial review of the Commissioner's decision to deny supplemental security income ("SSI"). (Doc. 1). The district court has jurisdiction under 42 U.S.C. §§ 1383(c) and 405(g). The parties consented to the undersigned's exercise of jurisdiction in accordance with 28 U.S.C. § 636(c) and Civil Rule 73. (Doc. 12). For the reasons contained herein, the undersigned reverses the decision of the Commissioner and remands for further proceedings.

## PROCEDURAL BACKGROUND

Anderson filed an application for SSI on behalf of Plaintiff in July 2014, alleging a disability onset date of March 21, 2014. (Tr. 110). The claim was denied initially and upon reconsideration. (Tr. 81-83, 87-89). Anderson then requested a hearing before an administrative law judge ("ALJ"). (Tr. 90-92). On February 16, 2017, Anderson (represented by an attorney) appeared and testified at a hearing before the ALJ. (Tr 41-61). On March 10, 2017, the ALJ found Plaintiff not disabled in a written decision. (Tr. 15-29). The Appeals Council denied Anderson's

request for review, making the hearing decision the final decision of the Commissioner. (Tr. 1-3); 20 C.F.R. §§ 416.1455, 416.1481. Anderson filed the instant action on behalf of Plaintiff on March 22, 2018. (Doc. 1).

## FACTUAL BACKGROUND[1]

Personal Background and Testimony

Plaintiff, born in March 2014, was a newborn on his alleged onset date, and almost three years old at the time of the hearing. *See* Tr. 110.

Anderson, Plaintiff's mother, testified her son was born with a cleft lip and cleft palate. (Tr. 45-46). In the weeks following his birth, Plaintiff had breathing difficulties, fluid in his ears, and pneumonia; he also had difficulty eating. (Tr. 46). Anderson further testified Plaintiff had a "half vertebrae" and a missing rib; he had surgery to repair a tethered spinal cord. *Id.* Anderson noted Plaintiff's missing rib caused back pain and he leaned to one side when he walked. (Tr. 47). Plaintiff's walking improved following surgery, but he was "still falling". (Tr. 46-47). He attended physical and occupational therapy to help improve his gait. (Tr. 47).

Plaintiff had difficulty speaking. He was "talking, but [] not using sentences, or [] not even putting more than three words together." (Tr. 47-48). Plaintiff saw a speech therapist who found that, at 30 months old, his language skill level was around that of an 18-month-old. (Tr. 48). Anderson noted Plaintiff's speech improved "slightly" with speech therapy, but he still drooled when he spoke and was unable to correctly pronounce words because his cleft palate prevented his lips from fully closing. (Tr. 58-59). He was unable to clearly express himself and threw tantrums in frustration. (Tr. 48-49). When angry, Plaintiff banged his head, even outside on the concrete.

_____

1. The undersigned summarizes the portions of the record relevant to the arguments raised by Ms. Anderson.

(Tr. 49) ("he'll just fall and bang his head"). Anderson described Plaintiff's tantrums as "extreme" and noted he was "just a very angry two-year-old.". (Tr. 53).

Plaintiff also had difficulty interacting with other children. (Tr. 49). He fought with his siblings "all the time" and "[did not] want to play with them". *Id*. Anderson further noted Plaintiff was violent when interacting with other children at daycare. (Tr. 57). She had to pick Plaintiff up early "once or twice every two weeks" due to such behavioral issues. (Tr. 58).

Relevant Medical Evidence

Following his birth, Plaintiff was admitted to the neonatal intensive care unit. (Tr. 425). Providers diagnosed a cleft hard palate (with a unilateral cleft lip); hemivertebra; and a ventricular septal defect. (Tr. 333-34). He was discharged at approximately three weeks old. (Tr. 336).

At a physical therapy evaluation in July 2014, Laura Redman, P.T., observed Plaintiff had "clear evidence of vertebral body abnormality". (Tr. 1567). Ms. Redman observed decreased neck rotation and lateral flexion with "severe" lateral neck creasing, redness, and taut skin. (Tr. 1568). She found Plaintiff "moderately hypotonic" in his neck, trunk, and upper extremities. *Id*. The same day, occupational therapist Tina Davis, O.T.R, observed Plaintiff exhibited poor handling/behavior; abnormal tone and weakness; balance/postural deficits; range of motion deficits/asymmetries; gross and fine motor deficits; and a risk of feeding deficits. (Tr. 1577).

In July 2014, Plaintiff underwent surgical repair of his cleft lip. *See* Tr. 672, 2554.

At an August 2014 physical therapy appointment, Ms. Redman assessed balance/postural deficits, range of motion deficits, and gross motor deficits. (Tr. 1766). She initiated a physical therapy program to address the asymmetries and motor deficits which impacted Plaintiff's development. *Id*.

In September 2014, Ms. Redman found Plaintiff had continued abnormal head positioning with lateral neck restriction. (Tr. 1810). She found Plaintiff's deficits warranted an in-home physical therapy program. *Id.* Later that month, Ms. Davis observed Plaintiff did not close his lips on a spoon when feeding and demonstrated "significant tongue thrusting", losing most of his food. (Tr. 1822).

An October 2014 MRI of Plaintiff's spine revealed hemivertebra at T4 associated with scoliosis with no evidence of canal narrowing or cord abnormality. (Tr. 1550). It also showed a lipoma of the filum with attachment to the posterior aspect of the canal in the scrum, a finding that "can be seen in cord tethering". *Id.*

At an appointment later in October 2014, Lisa M. Torres, M.D., observed Plaintiff had scoliosis (to the right) and a developmental delay in sitting up. (Tr. 1849). Dr. Torres diagnosed developmental coordination disorder. (Tr. 1850).

Plaintiff had a nine-month check-up in January 2015 with Emmanuel Boakye, M.D. (Tr. 1876-83). Dr. Boakye concluded Plaintiff was a "well" nine-month-old with delayed development, status post cleft lip repair, and a hemivertebrae at T4. (Tr. 1877). Plaintiff's parents completed an Ages and Stages Questionnaire, which Dr. Boakye reviewed and concluded the results fell within the "clinical concern" range, indicating an elevated risk of developmental delay. (Tr. 1883).

Plaintiff underwent a surgical repair of his cleft palate in May 2015. (Tr. 1954, 2554).

Plaintiff had a fourteen-month check-up in June 2015 with Dr. Boakye. (Tr. 2125-27). Dr. Boakye observed Plaintiff was unable to speak one to two words, stand on his own, or follow simple directions. (Tr. 2127). He concluded Plaintiff was a "well" fourteen-month-old with weight loss due to a recent cleft palate surgery. *Id.* Dr. Boakye observed a hemivertebrae at T4 and a tethered cord (per MRI), as well as an abnormal gait with incurved feet. *Id.*

Plaintiff saw pediatrician Irene Dietz, M.D., in February 2016. (Tr. 2227-28). Dr. Dietz found Plaintiff was at "extremely high risk . . . for developmental expressive language delay." (Tr. 2227). On examination, she observed Plaintiff had a "clear language delay" and referred him for speech and language services. (Tr. 2228).

In May 2016, Plaintiff saw speech and language pathologist Sue Ann Phillippbar, CCC-SLP, who found "significant speech and language delays" and recommended a speech and language assessment and intervention. (Tr. 2265).

That same month, Dr. Dietz observed Plaintiff was not stating words or babbling regularly. (Tr. 2242). She further noted Plaintiff's fine motor skills appeared to be age appropriate. *Id*. She recommended occupational therapy, noting gross motor delay. (Tr. 2244).

Plaintiff attended a neurosurgery follow-up in July 2016 with Robert Geertman, M.D. (Tr. 2356-59). Plaintiff's parents noted he ambulated without significant gait dysfunction, leg pain, or weakness. (Tr. 2356). Dr. Geertman diagnosed a tethered cord and hemivertebra; he recommended surgical treatment of the tethered cord. (Tr. 2359).

In September 2016, Dr. Dietz observed Plaintiff was speaking less than ten words. (Tr. 2408). She further noted that, at thirty months old, Plaintiff's language functioning was at the eighteen-month-old level; however, he walked without any gait abnormality, and self-fed from a sippy cup. *Id*. Plaintiff's results on the Modified Checklist for Autism in Toddlers ("M-CHAT") fell in the "clinical concern" range. (Tr. 2409).

At a pre-surgical sedation evaluation that same month, Dennis Super, M.D., observed Plaintiff had normal strength, tone, and gait. (Tr. 2420). He further noted Plaintiff's development was normal except for a speech delay. *Id*. ("one-word sentences, hard to understand").

Later that month, Plaintiff attended a pediatric speech and language screening with speech and language pathologist Deborah Lahey, CCC-SLP. (Tr. 2442-46). Plaintiff's mother reported he had delayed speech and language (Tr. 2443), and she could understand 80% of his speech (Tr. 2445). Ms. Lahey found Plaintiff had normal face symmetry but a moderate to severe drool. *Id*. Ms. Lahey estimated that Plaintiff understood language at a 21- to 24-month level and expressed language at a 15- to 18-month level. (Tr. 2446). His phonetic repertoire was limited for his age and he could only express ten to fifteen words. *Id.* Ms. Lahey found Plaintiff demonstrated a severe phonological disorder, severe oral-motor dysfunction, mild receptive language disorder, and severe expressive language disorder. *Id.*

Plaintiff saw Ms. Davis in October 2016. (Tr. 2473-76). She observed Plaintiff was interactive with his environment, had a small stature, poor tolerance of handling (transitions), decreased play skills, poor self-regulation, and an expressive and receptive language disorder; he was distractible with decreased attention. (Tr. 2474). Ms. Davis found Plaintiff's lips sealed "occasionally", and he generally demonstrated a "mouth open posture" with significant drooling. (Tr. 2475). Though Plaintiff was 31 months old, Ms. Davis assessed his overall functioning at the 26-month level. *Id*.

The same day, Plaintiff saw physical therapist Jessica Smith, P.T., for an evaluation. (Tr. 2480-84). Ms. Smith found Plaintiff had decreased foot positioning, congenital scoliosis due to a hemivertebra at T4, and decreased coordination. (Tr. 2481). Plaintiff also had decreased trunk stability when standing on dynamic surfaces, a slight gait lean to the right, and some gait compensations due to scoliosis. (Tr. 2482). Ms. Smith observed Plaintiff presented with poor behavior, gross motor delay, range of motion deficits, asymmetries, strength and balance deficits, postural deficits, poor quality of movement, gait abnormality, sensory dysfunction, and poor

endurance. (Tr. 2483). Later that same month, Ms. Smith noted a decreased overall gait quality. (Tr. 2501).

Four days after his second meeting with Ms. Smith, early intervention specialist Katherine Tierney of "Help Me Grow" completed an evaluation. (Tr. 1093-1103). She noted Plaintiff enjoyed other children and played with his peers – "laughing and sometimes sharing." (Tr. 1095). Plaintiff did not often use words to interact with peers. *Id*. Plaintiff recognized unfamiliar people and managed separation well. (Tr. 1096). He used approximately seven to ten words, "mostly to request or get his needs met." (Tr. 1097). Plaintiff could walk up stairs on his own, but needed support going down. *Id*. Ms. Tierney found Plaintiff to have adaptive, cognitive, communicative, and physical delays; he had no social/emotional delay. (Tr. 1103). She determined Plaintiff required early intervention services. *Id*.

Plaintiff also met with Ms. Lahey three times in October 2016. (Tr. 2458-59, 2492-93, 2505-06). She found Plaintiff "unintelligible". (Tr. 2459). Ms. Lahey noted Plaintiff opened and closed his mouth successfully twice during one session (Tr. 2493), but failed to close his lips independently at another (Tr. 2506). Plaintiff demonstrated "refusal" during the session with negative behaviors such as whining, dropping to the floor, and arching his back. *Id*.

Plaintiff had two speech therapy sessions with Ms. Lahey in November 2016. (Tr. 2510-11, 2526-27). Plaintiff had continued difficulty closing his lips. (Tr. 2511). He also had difficulty with self-regulation and refusals (Tr. 2511), and Ms. Lahey found these behavior overlays were "in the way [of] effective treatment." (Tr. 2527).

Plaintiff attended a physical therapy appointment with Ms. Smith in November 2016. (Tr. 2531-35). Plaintiff's presentation mirrored that from his visit the prior month. (Tr. 2535). Ms. Smith noted Plaintiff resisted directed activities and required encouragement throughout the

session. *Id*. He demonstrated overall weakness of the left lower extremity and resisted using his right upper extremity throughout the session. *Id*.

Also in November 2016, Plaintiff attended an intake assessment at the MetroHealth System Autism Clinic with Beth Bacon, LISW-S. (Tr. 2716-25). Plaintiff's mother was concerned he might be autistic due to his behavior at doctor's appointments and speech delay. (Tr. 2716). Ms. Bacon diagnosed disruptive behavior disorder and rule out autism spectrum disorder. (Tr. 2723).

In late November 2016, Plaintiff underwent a laminectomy for de-tethering of his spinal cord. (Tr. 2559).

Plaintiff saw Ms. Lahey again in December 2016. (Tr. 2767-68). Plaintiff continued to work on his lip closure, both in session with Ms. Lahey and at home with his mother. (Tr. 2768).

Later in December 2016, Plaintiff attended an occupational therapy session with Ms. Davis. (Tr. 2772-76). She noted Plaintiff lacked fine motor skills. (Tr. 2774). He could occasionally seal his lips completely, but generally demonstrated a "mouth open" posture with significant drooling. *Id*. Ms. Davis assessed abnormal upper extremity skills, abnormal active and passive range of motion, delayed fine motor skills, abnormal oral motor/feeding skills, decreased language skills, and decreased play skills. (Tr. 2775). Plaintiff was 32 months old, but functioning at a 26-month level. *Id*.

Plaintiff attended a physical therapy appointment with Ms. Smith in January 2017. (Tr. 2782-87). This was Plaintiff's first physical therapy session since his cord de-tethering and Anderson reported that Plaintiff fell less frequently. (Tr. 2783). On examination, Plaintiff's upper extremities could not be fully assessed and his lower extremities were within normal limits. (Tr. 2784). Plaintiff had decreased trunk stability when standing on dynamic surfaces and his gait leaned slightly to the right with some compensations due to scoliosis. *Id*. He had decreased

coordination while running. (Tr. 2785). Ms. Smith noted Plaintiff continued to exhibit decreased trunk control, hip strength, and overall balance. (Tr. 2786).

Plaintiff saw Ms. Lahey later the same day. (Tr. 2790-91). She noted Plaintiff's refusals were strong during this session with lots of "no's" when she attempted to change tasks or manipulate his lips. (Tr. 2791). Plaintiff used two-word utterances beyond his goal level, but his intelligibility was compromised. *Id*. He did not advance his abilities to perform certain sounds because he did not demonstrate lip closure or lip rounding. *Id*. At a therapy session later that month, Plaintiff demonstrated lip closure for the first time. (Tr. 2806).

In late January 2017, Plaintiff attended a physical therapy appointment with Ms. Smith. (Tr. 2810-15). Ms. Smith observed Plaintiff had decreased tolerance to activities during the session; he was irritable and resistant for the first fifteen minutes with multiple brief tantrums throughout. (Tr. 2814). Ms. Smith performed a Bayley Test for Infant Motor Performance and found Plaintiff (at 30 months old) had a 20-month age equivalency. (Tr. 2813-14). Plaintiff continued to exhibit decreased trunk control, hip strength, and overall balance. (Tr. 2814).

At an occupational therapy session three days later, Plaintiff cried throughout the session, threw toys, pushed Ms. Davis away, and was generally uncooperative. (Tr. 2819). Plaintiff attended a speech therapy appointment the same day where he had refusals throughout the session. (Tr. 2825). He did not imitate any oral-motor movements during the session. *Id*. Finally, at a physical therapy appointment later in the day, Plaintiff was unwilling to participate in activities, threw tantrums, and fell on the floor. (Tr. 2833). He continued to exhibit decreased trunk control, hip strength, and overall balance. *Id*.

Opinion Evidence

*Treating Sources*

In March 2014, Dr. Dietz wrote a letter in which she listed Plaintiff's "active problems" by diagnostic code. (Tr. 1112). She also noted Plaintiff required ongoing speech and language support services. *Id*. Dr. Dietz opined: "This child certainly should qualify for SSI services and DOES NOT have only issue[s] that are 'fully correctable by surgeries' as has been suggested to parent as a reason to not qualify. He will require ongoing services for many years." *Id*.

At an October 2016 visit, Ms. Lahey stated: "It is this SLP's opinion that pt should be on disability." (Tr. 2493).

*State Agency Physicians*

In October 2014, State agency physician Rachel Rosenfeld, M.D., provided a childhood disability evaluation. (Tr. 67-68). Dr. Rosenfeld opined Plaintiff had "no limitation" in the domains of: acquiring and using information; attending and completing tasks; interacting and relating with others; and caring for oneself. (Tr. 67). She found Plaintiff had "marked" limitation in the domain of moving about and manipulating of objects. *Id*. Dr. Rosenfeld noted this was due to "vertebral body anomaly with hemivertebra." *Id*. She found Plaintiff "show[ed] some gross motor delay with reduced midline control, hypotonia", and received physical therapy. *Id*. Finally, Dr. Rosenfeld found Plaintiff had "less than marked" limitation in the domain of health and physical well-being. (Tr. 67-68). This was due to Plaintiff's "cleft lip and palate which required repair." (Tr. 68). She also found Plaintiff appeared "to be feeding well following repair" with "normal weight gain" and

growth. *Id*. Dr. Rosenfeld further noted Plaintiff had tympanostomy tubes placed and had a normal hearing examination. *Id*.

In February 2015, State agency physician, John Mormol, M.D., completed a second childhood disability evaluation. (Tr. 77-78). Dr. Mormol also found Plaintiff had "no limitation" in the domains of: acquiring and using information; attending and completing tasks; interacting and relating with others; and caring for oneself. (Tr. 77). He noted Plaintiff's language and speech were normal. *Id*. Like Dr. Rosenfeld, Dr. Mormol found "marked" limitation in the domain of moving around and manipulation of objects. *Id*. However, Dr. Mormol gave different reasons, finding:

> Vertebral body anomaly with hemivertebra. Tethered cord found on MRI. Clmt was showing some gross motor delay with reduced midline control, hypotonia, for which he received PT. As of 6 mos WCC, he was working on sitting up and feeding, w/ a developmental delay noted in not sitting up. 11/14 OV also noted he was not yet sitting up and crawling, but did have good grasp strength, and nml tone, bulk, and strength. Babinski upgoing. At 9mos WCC, he was meeting 9 month developmental marks. No MSK/neuro abnormalities seen on two exams in 1/15.

*Id*. Finally, Dr. Mormol also found "less than marked" limitation in the domain of health and physical well-being. *Id*. He offered a similar explanation to Dr. Rosenfeld, but added that Plaintiff had a tethered cord with "normal" bowel and bladder function. (Tr. 77-78).

ALJ Decision

In a written decision, the ALJ found Plaintiff was born in March 2014, making him a newborn / young infant on the date of application and an older infant at the time of the decision. (Tr. 18). Plaintiff had not engaged in any substantial gainful activity since his application date. *Id*. The ALJ found Plaintiff had severe impairments of: hemivertebra with tethered spinal cord; status post-surgical correction of left-side cleft lip and palate; mild hearing loss, status post myringotomy

and tympanostomy; and history of ventricular septal defect. *Id*. The ALJ found none of these impairments met or medically equaled the severity of one of the listed impairments. *Id*.

Further, the ALJ found that Plaintiff did not have an impairment or combination of impairments that functionally equaled the severity of the listings. *Id*. The ALJ found Plaintiff had no limitation in the domains of: acquiring and using information and attending and completing tasks. (Tr. 23-25). He found Plaintiff had less than marked limitation in: interacting and relating with others, moving about and manipulating objects, ability to care for oneself, and health and physical well-being. (Tr. 25-28). Thus, the ALJ concluded, Plaintiff was not disabled from the date of his application through the date of the decision. (Tr. 29).

### STANDARD OF REVIEW

In reviewing the denial of Social Security benefits, the Court "must affirm the Commissioner's conclusions absent a determination that the Commissioner has failed to apply the correct legal standards or has made findings of fact unsupported by substantial evidence in the record." *Walters v. Comm'r of Soc. Sec.*, 127 F.3d 525, 528 (6th Cir. 1997). "Substantial evidence is more than a scintilla of evidence but less than a preponderance and is such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Besaw v. Sec'y of Health & Human Servs.*, 966 F.2d 1028, 1030 (6th Cir. 1992). The Commissioner's findings "as to any fact if supported by substantial evidence shall be conclusive." *McClanahan v. Comm'r of Soc. Sec.*, 474 F.3d 830, 833 (6th Cir. 2006) (citing 42 U.S.C. § 405(g)). Even if substantial evidence or indeed a preponderance of the evidence supports a claimant's position, the court cannot overturn "so long as substantial evidence also supports the conclusion reached by the ALJ." *Jones v. Comm'r of Soc. Sec.*, 336 F.3d 469, 477 (6th Cir. 2003).

**STANDARD FOR DISABILITY**

Eligibility for SSI is predicated on the existence of a disability. 42 U.S.C. § 1382(a). "Disability" is defined as the "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months." 20 C.F.R. § 416.905(a); *see also* 42 U.S.C. § 1382c(a)(3)(A). For claimants under the age of 18, the Commissioner follows a three-step evaluation process—found at 20 C.F.R. § 416.924(a)—to determine if a claimant is disabled:

1. Is claimant engaged in a substantial gainful activity? If so, the claimant is not disabled regardless of their medical condition. If not, the analysis proceeds.

2. Does claimant have a medically determinable, severe impairment, or a combination of impairments that is severe? For an individual under the age of 18, an impairment is not severe if it causes a slight abnormality or a combination of slight abnormalities which causes no more than minimal functional limitations. If there is no such impairment, the claimant is not disabled. If there is, the analysis proceeds.

3. Does the severe impairment meet, medically equal, or functionally equal the criteria of one of the listed impairments? If so, the claimant is disabled. If not, the claimant is not disabled.

To determine whether an impairment or combination of impairments functionally equals a listed impairment, the minor claimant's functioning is assessed in six different functional domains. 20 C.F.R. § 416.926a(b)(1). If the impairment results in "marked" limitations in two domains of functioning, or an "extreme" limitation in one domain of functioning, then the impairment is of listing-level severity and therefore functionally equal to the listings. *Id.* § 416.926a(a).

A "marked" limitation is one that is more than moderate but less than extreme, and interferes "seriously" with the ability to independently initiate, sustain, or complete activities. *Id.* § 416.926a(e)(2)(i). "It is the equivalent of functioning [one] would expect to find on standardized

testing with scores that are at least two, but less than three, standard deviations below the mean. *Id.* An "extreme" limitation is one that interferes "very seriously" with the ability to independently initiate, sustain, or complete activities. *Id.* § 416.926a(e)(3)(i). The six functionality domains are: 1) acquiring and using information, 2) attending and completing tasks, 3) interacting and relating with others, 4) moving about and manipulating objects, 5) caring for yourself, and 6) health and physical well-being. *Id.* § 416.926a(b)(1). In determining functional equivalence, the ALJ must consider the "whole child." Social Security Ruling 09–lp, 2009 WL 396031, at *2.

## DISCUSSION

Anderson raises two objections to the ALJ's decision. First, she argues the ALJ failed to make the required findings at Steps Two and Three as to Plaintiff's speech disorder and disruptive behavior disorder. Second, she argues the ALJ failed to properly evaluate the opinion evidence of record. The Commissioner responds that the ALJ's decision is supported by substantial evidence and should be affirmed. For the reasons discussed herein, the undersigned reverses the decision of the Commissioner and remands for further consideration of the domains of acquiring and using information and interacting and relating with others.

Step Two

Anderson first argues the ALJ erred at Step Two when he "failed to make any findings whatsoever regarding the 'severity' of the child's speech and language disorder and disruptive behavior disorder[.]" (Doc. 16, at 23). For the reasons discussed below, the undersigned finds no error with the ALJ's consideration of Plaintiff's disruptive behavior disorder, but reverses as to Plaintiff's speech and language disorder.

At Step Two of the disability analysis, the ALJ determines whether a claimant has a medically determinable impairment (or a combination of impairments), that is "severe". 20 C.F.R.

§ 416.924(a). By definition, a "severe" impairment is one that "significantly limit[s] your physical or mental ability to do basic work activities". 20 C.F.R. § 416.922(a). "After an ALJ makes a finding of severity as to even one impairment, the ALJ 'must consider limitations and restrictions imposed by *all* of an individual's impairments, even those that are not 'severe.'" *Nejat v. Comm'r of Soc. Sec.*, 359 F. App'x 574, 576-77 (6th Cir. 2009) (quoting SSR 96-8p, 1996 WL 374184, at *5) (emphasis added). In other words, if a claimant has at least one severe impairment, the ALJ must continue the disability evaluation and consider *all* of the limitations caused by the claimant's impairments – severe or not. When an ALJ considers all of a claimant's impairments in the remaining steps of the disability determination, the failure to find additional severe impairments does not constitute reversible error. *Id.* at 577 (citing *Maziarz v. Sec'y of Health & Human Servs.*, 837 F.2d 240, 244 (6th Cir. 1987)).

The ALJ found Plaintiff had the severe impairments of: hemivertebra with tethered spinal cord; status post-surgical correction of left-side cleft lip and palate; mild hearing loss, status post myringotomy and tympanostomy; and history of ventricular septal defect. (Tr. 18). The Commissioner argues there is no error as to the omission of Plaintiff's speech and language disorder because the ALJ considered Plaintiff's underlying physical impairments which affected his speech (cleft lip and palate). (Doc. 19, at 8) (citing Tr. 18). The ALJ's failure to find Plaintiff's speech and language disorder a "severe" impairment is not itself harmful error, however, as noted above, so long as the ALJ still considered this impairment throughout his disability analysis and considered any limitations imposed by it. SSR 96-8p, 1996 WL 374184, at *5. For the reasons more thoroughly discussed below, the undersigned finds the ALJ did not properly consider Plaintiff's speech and language disorder throughout his opinion and reverses the decision in this regard.

As to Plaintiff's disruptive behavior disorder, though the ALJ does not discuss the diagnosis by name, it is clear by his analysis at Step Three that he considered Plaintiff's behavioral impairments, as required, and his analysis (in this regard) is supported by substantial evidence for the reasons thoroughly discussed below.

Thus, the undersigned finds no error with the ALJ's consideration of Plaintiff's disruptive behavior disorder, but reverses as to Plaintiff's speech and language disorder.

Step Three: Functional Equivalence

Anderson argues the ALJ should have found Plaintiff more limited in the domains of acquiring and using information and interacting and relating with others. (Doc. 16, at 22-26). Specifically, Anderson alleges the ALJ's failure to consider Plaintiff's speech and language disorder and his behavioral disorder within these domains is error. For the following reasons, the undersigned reverses the Commissioner's decision in this regard.

*Acquiring and Using Information*

The domain of acquiring and using information considers "how well you acquire or learn information, and how well you use the information you have learned." 20 C.F.R. § 416.926a(g). Specifically, "[y]ou must also be able to use language to think about the world and to understand others and express yourself; e.g., to follow directions, ask for information, or explain something." *Id*. The regulations define the expectations in this domain for newborns and infants (birth to age one) as follows:

> At this age, you should show interest in, and explore, your environment. At first, your actions are random; for example, when you accidentally touch the mobile over your crib. Eventually, your actions should become deliberate and purposeful, as when you shake noisemaking toys like a bell or rattle. You should begin to recognize, and then anticipate, routine situations and events, as when you grin with expectation at the sight of your stroller. You should also recognize and gradually attach meaning to everyday sounds, as when you hear the telephone or your name.

Eventually, you should recognize and respond to familiar words, including family names and what your favorite toys and activities are called

20 C.F.R. § 416.926a(g)(2)(i). For older infants and toddlers (age one age three), the expectations change:

At this age, you are learning about the world around you. When you play, you should learn how objects go together in different ways. You should learn that by pretending, your actions can represent real things. This helps you understand that words represent things, and that words are simply symbols or names for toys, people, places, and activities. You should refer to yourself and things around you by pointing and eventually by naming. You should form concepts and solve simple problems through purposeful experimentation (e.g., taking toys apart), imitation, constructive play (e.g., building with blocks), and pretend play activities. *You should begin to respond to increasingly complex instructions and questions, and to produce an increasing number of words and grammatically correct simple sentences and questions.*

20 C.F.R. § 416.926a(g)(2)(ii) (emphasis added).

Examples of limited functioning in this domain (although such examples do not necessarily indicate a marked or extreme limitation) include: 1) not demonstrating understanding of words about space, size, or time; 2) *not rhyming words or the sounds in words*; 3) having difficulty recalling important things you learned in school yesterday; 4) having difficulty solving mathematics questions or computing arithmetic answers; and 5) *only speaking in short, simple sentences and having difficulty explaining what you mean*. 20 C.F.R. § 416.926a(g)(3)(i)-(vi) (emphasis added).

The undersigned finds the ALJ's assessment of "no limitation" in this domain unsupported by substantial evidence. In his opinion, the ALJ explained:

Claimant is able to show interest in, and explore, his environment. In September 2014, he was reaching more for toys (Exhibit 7F/303). Help Me Grow records indicate claimant can follow verbal commands. He often refused to comply with simple requests, despite likely understanding what was asked of him. He briefly explored books and touched the pictures. He quickly matched and named colors when playing with chips and he matched simple shapes easily. However, he was less interested in completing tasks that he was

> prompted/asked to do or that involved him attending to a directive or instruction, Maurice shows many age expected skills but continues to show some functioning that might be described like that of a slightly younger child in the area of the outcome (Exhibit 12F/7).

(Tr. 24).

The undersigned finds this analysis unsupported because, as Anderson argues, the ALJ's analysis here is completely devoid of any discussion regarding Plaintiff's speech impairments. This is particularly problematic considering this domain focuses on, *inter alia*, how a plaintiff "use[s] language to think about the world and [] understand others and express [themselves]; e.g., to follow directions, ask for information, or explain something." 20 C.F.R. § 416.926a(g). There is *overwhelming* record evidence in this case which demonstrates Plaintiff's ongoing speech and language impairments. First, and most obviously, Plaintiff was born with a unilateral cleft lip and cleft palate. (Tr. 333). These were surgically repaired (Tr. 672, 1957, 2554), but Plaintiff remained unable to close his lips (Tr. 1822, 2506, 2511, 2791), even with the assistance of a speech therapist. Plaintiff also demonstrated clear and continuous speech and language delays. *See* Tr. 2127 (unable to speak one to two words); Tr. 2228 ("active and clear language delay"); Tr. 2242 (not stating words or babbling regularly); Tr. 2265 (using five or fewer words functionally, "significant speech and language delays"); Tr. 2408 (using "not even 10 words"); Tr. 2420 (using "one word sentence, hard to understand"); Tr. 2446 ( "expressing language at approximately a 15-18 month old level" at 30 months old); Tr. 2459 ( "unintelligible"); Tr. 2791 ( "intelligibility is compromised").

The ALJ's assessment of Plaintiff's functioning in this domain makes no mention of these speech and language impairments, making it impossible for the Court to determine whether he considered them. The Commissioner argues there is no error because the ALJ considered Plaintiff's underlying physical impairments which affected his speech (cleft lip and palate). (Doc. 19, at 8) (citing Tr. 18). Alternatively, the Commissioner argues the ALJ's failure to fully address

the speech and language impairments here amounts to harmless error because, to meet the listings, a "marked" limitation is required in two domains. *Id*. at 9-10. However, for the Commissioner's argument to succeed, the Court would have to *assume* that: (1) the ALJ contemplated (without mentioning) Plaintiff's speech and language delays within his finding Plaintiff had a cleft lip and palate; (2) the ALJ's consideration of Plaintiff's speech and language impairments would not result in an "extreme" limitation – thereby functionally equaling the listing; and (3) the ALJ did not err in finding less than marked limitation in any other domain. The Court will not so assume, because these determinations are the ALJ's, however, not the Court's, to make in the first instance. For these reasons, the undersigned reverses the Commissioner's decision and remands for further consideration of Plaintiff's speech and language impairment within this domain.

*Interacting and Relating with Others*

The domain of interacting and relating with others considers "how well you initiate and sustain emotional connections with others, develop and use the language of your community, cooperate with others, comply with rules, respond to criticism, and respect and take care of the possessions of others." 20 C.F.R. § 416.926a(i). The regulations define the expectations in this domain for newborns and infants (birth to age one) as follows:

> You should begin to form intimate relationships at birth by gradually responding visually and vocally to your caregiver(s), through mutual gaze and vocal exchanges, and by physically molding your body to the caregiver's while being held. You should eventually initiate give-and-take games (such as pat-a-cake, peek-a-boo) with your caregivers, and begin to affect others through your own purposeful behavior (e.g., gestures and vocalizations). You should be able to respond to a variety of emotions (e.g., facial expressions and vocal tone changes). You should begin to develop speech by using vowel sounds and later consonants, first alone, and then in babbling.

20 C.F.R. § 416.926a(i)(2)(i). For older infants and toddlers (age one to age three), the expectations change:

At this age, you are dependent upon your caregivers, but should begin to separate from them. You should be able to express emotions and respond to the feelings of others. You should begin initiating and maintaining interactions with adults, but also show interest in, then play alongside, and eventually interact with other children your age. You should be able to spontaneously communicate your wishes or needs, first by using gestures, and eventually by speaking words clearly enough that people who know you can understand what you say most of the time.

20 C.F.R. § 416.926a(i)(2)(ii).

Examples of limited functioning in this domain (although such examples do not necessarily indicate a marked or extreme limitation) include: 1) not reaching out to be picked up and held; 2) having no close friends, or friends are all older or younger; 3) avoiding or withdrawing from people the child knows, or the child is overly anxious or fearful of meeting new people or trying new things; 4) having difficulty with playing games or sports with rules; 5) having difficulty communicating with others; and 6) *having difficulty speaking intelligibly or with adequate fluency*. 20 C.F.R. § 416.926a(i)(3)(i)-(vi) (emphasis added).

The undersigned finds the ALJ's assessment of "less than marked" limitation in this domain unsupported by substantial evidence. In his opinion, the ALJ explained:

Records from Help Me Grow note that claimant was only around siblings and occasionally cousins. He was content as long as he had his cup. He enjoyed other children. He played with is peers. He can become upset if he does not get his way. He did not use words to interact with peers at playtime (Exhibit 12F/5). Claimant liked to play "peek a boo". He recognized unfamiliar people and managed separation well, as he was usually with familiar people. He had difficulty sharing things (Exhibit 12F/6). Claimant's mother testified that he fights with his sisters and other children at daycare. She testified she has to go to daycare approximately every two weeks due to claimant's behavior. There is a lack of evidence of record to support these problems at daycare.

(Tr. 26).

Like the domain of acquiring and using information, this domain also involves spoken language. 20 C.F.R. § 416.926a(i)(2)(ii) ("You should be able to spontaneously communicate your wishes or needs, first by using gestures, and eventually by speaking words clearly enough that

people who know you can understand what you say most of the time."). And, as with the domain of acquiring and using information, the ALJ did not discuss Plaintiff's speech and language impairments under this domain, giving no indication he even considered them. For the reasons thoroughly discussed above, the Court finds there is evidence in the record to show Plaintiff had speech and language impairments for a sustained period. The ALJ's consideration of these impairments may or may not change his determination, but that is not for this Court to decide in the first instance. Thus, the undersigned reverses the decision of the Commissioner in this regard and remands for further consideration of Plaintiff's speech and language impairments in this domain.

Second, as it relates to this domain, Anderson argues the ALJ's "failure to provide meaningful discussion" of Plaintiff's disruptive behavior disorder is error. (Doc. 16, at 24-26). Though the ALJ does not discuss the diagnosis by name, it is clear by his analysis that he considered Plaintiff's behavioral impairments and his analysis (in this regard) is supported by substantial evidence. For example, the ALJ cites Plaintiff's Help Me Grow records where Plaintiff played with his peers and got along well with other children. (Tr. 26) (citing Tr. 1095). He further noted Plaintiff recognized unfamiliar people and managed separation well. *Id.* (citing Tr. 1096). Finally, the ALJ discussed Anderson's testimony that she had to pick up Plaintiff early from daycare every two weeks due to his behavior. *Id.* However, he noted there were no daycare records provided which would support these problems. *Id.* The undersigned finds these reasons are supported, and finds no error in the ALJ's consideration of Plaintiff's disruptive behavior disorder as it relates to the domain of interacting and relating with others.

Opinion Evidence

Anderson next argues the ALJ erred when he "failed to provide legally sufficient rationale" for rejecting or discounting the opinions of: both State agency reviewing physicians (Drs. Rosenfeld and Mormol), Dr. Dietz, and Ms. Lahey. For the reasons discussed below, the undersigned finds no error with the ALJ's analysis as to these sources.

*Dr. Dietz*

Anderson first argues the ALJ failed to accord proper deference to the opinion of Dr. Dietz, a treating physician. (Doc. 16, at 28-34). For the following reasons, the undersigned finds no error.

Generally, medical opinions of treating physicians are accorded greater deference than non-treating physicians.[2] *Rogers v. Comm'r of Soc. Sec.,* 486 F.3d 234, 242 (6th Cir. 2007); *see also* SSR 96–2p, 1996 WL 374188. "Because treating physicians are 'the medical professionals most able to provide a detailed, longitudinal picture of [a claimant's] medical impairments and may bring a unique perspective to the medical evidence that cannot be obtained from the objective medical findings alone,' their opinions are generally accorded more weight than those of non-treating physicians." *Rogers*, 486 F.3d at 242.

A treating physician's opinion is given "controlling weight" if it is supported by: 1) medically acceptable clinical and laboratory diagnostic techniques; and 2) is not inconsistent with other substantial evidence in the case record. *Id.* (citing *Wilson v. Comm'r of Soc. Sec.*, 378 F.3d 541, 544 (6th Cir. 2004)).

---

2. Although recent revisions to the CFR have changed the rules regarding evaluation of treating physician opinions, such changes apply to claims filed after March 27, 2017, and do not apply to claims filed prior to that date. *See* Social Sec. Admin., *Revisions to Rules Regarding the Evaluation of Medical Evidence*, 82 Fed. Reg. 5852-53, 2017 WL 168819.

Importantly, when the physician's medical opinion is not granted controlling weight, the ALJ must give "good reasons" for the weight given to the opinion. *Rogers*, 486 F.3d at 242 (quoting 20 C.F.R. § 416.927(d)(2)). These reasons must be "sufficiently specific to make clear to any subsequent reviewers the weight the adjudicator gave to the treating source's medical opinion and the reasons for that weight." *Wilson,* 378 F.3d at 544 (quoting SSR 96-2p, 1996 WL 374188, at *5). When determining weight and articulating "good reasons", the ALJ "must apply certain factors" to the opinion. *Rabbers v. Comm'r of Soc. Sec.*, 582 F.3d 647, 660 (6th Cir. 2009) (citing 20 C.F.R. § 404.1527(d)(2)). These factors include the length of treatment relationship, the frequency of examination, the nature and extent of the treatment relationship, the supportability of the opinion, the consistency of the opinion with the record as a whole, and the specialization of the treating source. *Id.* While an ALJ is required to delineate good reasons, he is not required to enter into an in-depth or "exhaustive factor-by-factor analysis" to satisfy the requirement. *Francis v. Comm'r Soc. Sec. Admin.*, 414 F. App'x 802, 804-05 (6th Cir. 2011).

In evaluating Dr. Dietz's opinion, the ALJ explained:

The undersigned specifically rejects the medical opinion of Irene Cihon Dietz M.D. that the claimant "should qualify for SSI services" (Exhibit 13F), as this an opinion in effect that the claimant is disabled, which concerns an issue that is reserved for the Commissioner (SSR 96-5p). This report is also essentially a "laundry list" of the claimant's impairments without sufficient supporting objective findings regarding the claimant's functional limitations. Therefore, the undersigned rejects this report as evidence and accords it no weight under authority of 20 CFR 416.927, SSR 96-2p and SSR 06-3p.

(Tr. 22).

Here, the ALJ rejected Dr. Dietz's opinion on two grounds: (1) her conclusory statement that Plaintiff "should qualify for SSI services" is a determination reserved to the Commissioner; and (2) that her opinion merely re-states Plaintiff's diagnoses and does not offer any analysis

regarding his functional limitations. *Id.* The undersigned finds these are "good reasons" for rejecting the opinion of Dr. Dietz.

As to the first reason, Anderson is correct that medical opinions of treating physicians are generally given more deference, however, her argument fails to recognize that **the regulations specifically define what does – and does not – constitute a "medical opinion"**. That is, "medical opinions" are defined as: "statements from acceptable medical sources that reflect judgments about the nature and severity of your impairment(s), including your symptoms, diagnosis and prognosis, what you can still do despite impairment(s), and your physical or mental restrictions." 20 C.F.R. § 416.927(a)(1). The regulations further define what is *not* a medical opinion, they are instead an "opinion on issues reserved to the Commissioner because they are administrative findings that are dispositive of a case[.]" 20 C.F.R. § 416.927(d). Included in this category is a conclusive determination by a medical source that a plaintiff is disabled. This is because:

> We are responsible for making the determination or decision about whether you meet the statutory definition of disability. In so doing, we review all of the medical findings and other evidence that support a medical source's statement that you are disabled. A statement by a medical source that you are "disabled" or "unable to work" does not mean that we will determine that you are disabled.

20 C.F.R. § 416.927(d)(1). However, "opinions from any medical source on issues reserved to the Commissioner must never be ignored. The adjudicator is required to evaluate all evidence in the case record that may have a bearing on the determination or decision of disability, including opinions from medical sources about issues reserved to the Commissioner." *See* SSR 96-5p, 1996 WL 374183, at *3. Further, "the adjudicator is *precluded* from giving any special significance to the source; e.g., giving a treating source's opinion controlling weight, when weighing these opinions on issues reserved to the Commissioner." *Id.* (emphasis added).

Here, Dr. Dietz's conclusion that Plaintiff "should qualify for SSI services" is nothing more than a conclusory statement on a determination reserved exclusively to the Commissioner – it is not evidence. 20 C.F.R. § 416.927(d); *see also, e.g., Myland v. Comm'r of Soc. Sec.*, 2017 WL 5632842, at *1 (6th Cir.) (finding an ALJ reasonably disregarded a treating physician's conclusion a plaintiff was disabled because such a conclusion was reserved for the Commissioner) (citing *Bass v. McMahon*, 499 F.3d 506, 511 (6th Cir. 2007)); *Jordan v. Comm'r of Soc. Sec.*, 2019 WL 582457, at *16 (N.D. Ohio 2019) ("Dr. Waltman offered an opinion on an issue reserved to the Commissioner, i.e., an opinion that Jordan was disabled. . . whether a claimant is disabled is an issue reserved to the Commissioner and, therefore, it was appropriate for the ALJ to discount Dr. Waltman's opinion[.]"). Thus, it was entirely proper for the ALJ to discount this portion of Dr. Dietz's opinion on such grounds. And, as noted, the ALJ was expressly precluded from according this opinion controlling weight. SSR 96-5p, 1996 WL 374183, at *3.

Next, the ALJ turned to the rest of Dr. Dietz's letter, which contained an itemized list of Plaintiff's diagnoses and noted a need for ongoing speech and language services. (Tr. 22) (citing Tr. 1112). The ALJ rejected this portion of Dr. Dietz's opinion because it was merely a "'laundry list' of the claimant's impairments without sufficient supporting objective findings regarding the claimant's functional limitations." *Id*. The undersigned finds this conclusion provides the required "good reasons" for declining to afford the opinion controlling weight because it implicates the factor of supportability. 20 C.F.R. § 416.927(c). As noted, a "medical opinion" is a statement from an acceptable medical source "that reflect[s] judgments about the nature and severity of your impairment(s), including your symptoms, diagnosis and prognosis, what you can still do despite impairment(s), and your physical or mental restrictions." 20 C.F.R. § 416.927(a)(1). As the ALJ correctly observed, Dr. Dietz's letter contains only a list of Plaintiff's diagnoses and a conclusion

that he will require ongoing speech and language therapy services. (Tr. 22) (citing Tr. 1112). The letter does not contain *any* findings as to Plaintiff's symptoms, or *any* findings as to his physical or mental restrictions. *See* Tr. 1112. Because the letter is devoid of any analysis beyond a disability conclusion and a symptom list, the ALJ concluded the opinion was unsupported by any objective findings. (Tr. 22). The ALJ's reason here directly implicates the supportability factor under the regulations. 20 C.F.R. § 416.927(c) ("The more a medical source presents relevant evidence to support a medical opinion, particularly medical signs and laboratory findings, the more weight we will give that medical opinion."). Thus, the undersigned finds the ALJ's decision to assign less than controlling weight to Dr. Dietz's conclusory opinion is supported by the required "good reasons".

*Ms. Lahey*

Anderson advances a similar argument regarding the ALJ's assessment of the opinion of Plaintiff's treating speech-language pathologist, Ms. Lahey. (Doc. 16, at 31-34). She argues the ALJ did not afford Ms. Lahey's opinion that Plaintiff "should be on disability" proper deference. *Id*. For the following reasons, the undersigned finds no error.

A "treating source" is "your own *acceptable medical source* who provides you, or has provided you, with medical treatment or evaluation and who has, or has had, an ongoing treatment relationship with you." 20 C.F.R. § 416. 927(a)(2) (emphasis added). Qualified speech-language pathologists are considered "acceptable medical sources" under the regulations. 20 C.F.R. § 416.927(a), (c); *see also* SSR 06-0p3, 2006 WL 2329939, at *2. As such, a speech-language pathologist is subject to the treating-physician rule under the regulations thereby entitling her opinion to greater deference. *See* 20 C.F.R. § 416.913(a); *see also* SSR 06-03, 2006 WL 2329939,

at *2; *Merlone v. Comm'r of Soc. Sec.*, 2016 WL 4726567, at *6 (E.D. Mich.), *report and recommendation adopted*, 2016 WL 4720423.

The ALJ offered reasons similar to those he cited as to Dr. Dietz's opinion for assigning "little weight" to Ms. Lahey's opinion, concluding:

> Deborah Lahey, MA, CCC-SLP, conducted a pediatric speech and language screening evaluation on September 26, 2016. Claimant was a 30-month-old male. Claimant appeared to be understanding language at approximately the 21-24-month-old level and expressing language at approximately the 15-18-month level. He expressed approximately 10-15 words. Claimant showed a severe phonological disorder, severe oral-motor dysfunction, mild receptive language disorder and severe expressive language disorder. Follow up speech-language therapy at MetroHealth Medical Center was recommended (Exhibit l7F/26-30). Records show the claimant did participate in speech therapy (Exhibit l7F). At a visit on October 17, 2016, speech pathologist Lahey opined the claimant should be on disability (Exhibit 17F/77). The undersigned gives this opinion little weight as the speech pathologist is only dealing with one area of claimant's impairments. In addition, this concerns an issue that is reserved for the Commissioner (SSR 96-5p).

(Tr. 21).

First, the ALJ gave Ms. Lahey's opinion "little" weight because, as a speech pathologist, she only dealt with one area of Plaintiff's impairments. As noted above, under the regulations, a childhood disability determination requires a much broader assessment of Plaintiff's functioning across six domains – many of which are not impacted by Plaintiff's speech impairments. 20 C.F.R. § 416.926a(b)(1). Thus, the ALJ's conclusion that Ms. Lahey is unqualified to make a conclusive determination of disability after only treating Plaintiff for a speech impairment is supported.

Next, the ALJ properly gave Ms. Lahey's opinion "little" weight because, like Dr. Dietz, her opinion is a conclusory statement on an issue reserved exclusively for the Commissioner. 20 C.F.R. § 416.927(d); *see also Myland,* 2017 WL 5632842, at *1. Ms. Lahey offered no opinion beyond stating "[i]t is this SLP's opinion that PT should be on disability." (Tr. 2493). Like Dr. Dietz, she offered no specific functional limitations with this opinion. As such, the ALJ is expressly

precluded under the regulations from according it controlling weight. SSR 96-5p, 1996 WL 374183, at *3. And further, the regulations permit an ALJ to discount opinions which are unexplained. 20 C.F.R. § 416.927(c)(3) ("The better an explanation a source provides for a medical opinion, the more weight we will give that medical opinion."). For these reasons, the ALJ provided the required "good reasons" in assigning less than controlling weight to Ms. Lahey's opinion.

*State Agency Physicians*

Finally, Anderson argues the ALJ erred in his consideration of the State agency physicians' opinions. (Doc. 16, at 29-32). Specifically, she contends the ALJ erred in not addressing the opinions' consistency with one another and that each determined Plaintiff had a marked limitation in the domain of moving about and manipulating objects. *Id.* For the following reasons, the undersigned finds no error in the ALJ's analysis of the State agency physician opinions.

As an initial matter, the opinion of a non-examining State agency physician is not weighted the same as a treating physician. Under the regulations, there exists a hierarchy of medical opinions: first, is the treating source (as discussed above); second, is the non-treating source, one who has examined but not treated the plaintiff; and last, is a non-examining source, one who renders an opinions based on a review of the medical record as a whole. 20 C.F.R. § 416.902. An ALJ must provide "good reasons" for the weight given to a treating source, *Warner v. Comm'r of Soc. Sec.,* 375 F.3d 387, 391 (6th Cir. 2004), but not for a non-treating or non-examining source, *Smith v. Comm'r of Soc. Sec.*, 482 F.3d 873, 876 (6th Cir. 2007) (holding "the SSA requires ALJs to give reasons for only *treating* source" opinions) (emphasis in original); *Murray v. Comm'r of Soc. Sec.*, 2013 WL 5428734, at *4 (N.D. Ohio) ("Notably, the procedural 'good reasons' requirement does not apply to non-treating physicians."). "Under certain circumstances, an ALJ may assign greater weight to a state agency consultant's opinion than to that of a treating or

examining source." *Miller v. Comm'r of Soc. Sec.*, 811 F.3d 825, 834 (6th Cir. 2016) (citing SSR 96–6p, 1996 WL 374180, at *2–3). This is because the Commissioner views such medical sources "as highly qualified physicians and psychologists who are experts in the evaluation of the medical issues in disability claims under the [Social Security] Act." SSR 96–6p, 1996 WL 374180, at *2–3.

The ALJ gave "some" weight to the State agency physicians, finding, in relevant part:

> Records submitted after the State agency review show claimant's motor functioning is improving with occupational and physical therapy. He has a less than marked limit in this domain, rather than a marked limit.

(Tr. 22).

Here, the ALJ concluded the physicians' findings of marked limitation in the domain of moving about and manipulating objects was unsupported because the physicians did not have access to subsequent records showing improvements in Plaintiff's motor skills and physical abilities following physical therapy. (Tr. 22). This conclusion is supported by substantial evidence. The ALJ is correct that the State agency physicians provided their opinions in March 2014 and February 2015 (Tr. 67-68, 77-78), and Plaintiff underwent extensive physical and occupational therapy after those dates (as detailed above). The ALJ cited Plaintiff's improvements later in his opinion within the domain of moving about and manipulating objects. (Tr. 27). Specifically, he noted that Plaintiff's fine and gross motor skills were age appropriate as of May 30, 2016. *Id.* (citing Tr. 1067). Further, the ALJ cited Plaintiff's Help Me Grow records which detail he was able to walk up stairs on his own, but needed assistance going down. *Id.* (citing Tr. 1094). These points are accurately cited by the ALJ and provide substantial evidence to discount the State agency physicians. And, because the State agency physicians are non-treating sources, the heightened "reasons giving" requirement is inapplicable to their opinions. *See Smith*, 482 F.3d at

876 ("[T]he SSA requires ALJs to give reasons for only *treating* sources."); *see also Reeves v. Comm'r of Soc. Sec.*, 618 Fed.Appx. 267, 273 (6th Cir. 2015) (same). Although Anderson can point to evidence suggesting a contrary conclusion, this Court must affirm even if substantial evidence, or indeed a preponderance of the evidence, supports a claimant's position, "so long as substantial evidence also supports the conclusion reached by the ALJ." *Jones,* 336 F.3d at 477. For these reasons, the undersigned finds substantial evidence supports the ALJ's consideration of the State agency physician opinions.

## CONCLUSION

Following review of the arguments presented, the record, and the applicable law, the undersigned finds the Commissioner's decision to deny SSI not supported by substantial evidence. Accordingly, the decision of the Commissioner is reversed and remanded pursuant to Sentence Four of 42 U.S.C. §405(g).

**IT IS SO ORDERED.**

 s/ James R. Knepp II
United States Magistrate Judge